# DECLARATION IN SUPPORT OF CIVIL FORFEITURE

I, Sean P. Reilly, a Drug Enforcement Administration ("DEA") Special Agent, make the following unsworn declaration pursuant to 28 U.S.C. § 1746:

## I. BACKGROUND, TRAINING, AND EXPERIENCE

1. I have been a DEA Special Agent since May 2021. I am currently assigned to the Dallas Field Division, Enforcement Group 2, and conduct criminal investigations throughout the Eastern District of Texas and elsewhere. Over the course of my career, I have received specialized training regarding drug trafficking and money laundering from the United States Department of Justice. My career has included numerous long-term special assignments—in the United States and abroad—investigating drug enforcement and money laundering organizations ("DTOs" and "MLOs").

2. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General. I have participated in numerous investigations related to illegal drug trafficking, among other things, have conducted or participated in surveillance, the execution of search warrants, and debriefings of informants related to drug trafficking and money laundering. I have drafted affidavits for search warrants including tracking of vehicles, cellular phones, and searches of residences and electronic devices. I also consult with other agents with extensive experience in drug trafficking investigations. As a result, I am familiar with common practices to promote and facilitate drug trafficking.

**Exhibit A**

3. I am a Certified Anti-Money Laundering Specialist through the Association of Certified Anti-Money Laundering Specialists, which provides training and assists other organizations such as banks and law enforcement agencies through its internationally recognized program of anti-money laundering courses. As such, I specialize in detecting domestic and international money laundering activities throughout the use of several investigative tools. Within the DEA, the investigation into money laundering activity involves the laundering of illicit proceeds earned through the sale and distribution of controlled substances. Recognizing trends and patterns with modern-day money launderers is an integral part of conducting drug-related investigations, as the seizure of assets has been found to greatly cripple and disrupt DTOs and MLOs.

4. I am a certified user of multiple forms of software utilized to track the flow of assets, particularly cryptocurrency, as it exchanges possession and location(s). As such, I have been trained to detect indicators of money laundering and/or illicit activity with said software.

5. Based on my training and experience, I am aware of the following:

A. Drug trafficking organizations (DTOs) generate large amounts of cash proceeds in the U.S. and elsewhere. In order to repatriate their cash proceeds from the U.S. and other countries back to their country of origin where they can be used by the DTO members, DTOs often employ professional money launderers. For a fee, professional money launderers provide the DTO with currency in the DTO's native country in exchange for bulk currency in the country where the DTO's narcotics are distributed.

B. Professional money launderers utilize a variety of methods to accomplish their goals including trade-based money laundering, bulk currency smuggling and virtual currency trading.

C. Professional money launderers typically charge a commission fee ranging from a 7% average for established, high-volume laundering (such as that found in fraud and drug-trafficking conspiracies) to 35% for heightened digital tracking risks and specialized mitigation needs (such as necessary with cybercrime proceeds) of the total capital being moved.

D. Other factors may influence the money launderer's fee: volume (small amounts vs. bulk wholesale laundering can command larger or smaller percentages respectively), urgency (fast turnaround times drive up the commission price), and method (using established shall companies or traditional banking may cost more than crypto-to-cash or trade-based laundering).

E. There are several red flags or warning signs common to money laundering operations:

(1) Withholding "Know Your Customer" Information—A customer's reluctance to provide (or a company's willingness to ignore said reluctance—especially a financial service company) complete identification, business purpose, or source of wealth;
(2) Identity Mismatch—A subject's background or lifestyle contradicts expected activity or declared income;
(3) Evasive Actions—Frequent changes to personal details, contact information, or avoiding face-to-face contact without reason;
(4) Unusual Representation—Use of nominees, proxies, or third parties to hide the real controller of funds;
(5) Rapid Movement—Money enters and leaves an account almost immediately (showing pass-through or conduit activity);
(6) Structuring (also known as "Smurfing")—frequent cash transactions under reporting thresholds;
(7) No Economic Rationale—Transfers or trades that make no logical business, personal, or financial sense;
(8) Shell Companies—Corporate entities with minimal actual business operations but high cash flow;
(9) Complex Ownership—Layered or opaque trust and corporate structures that obscure ownership;
(10) High-Risk Jurisdictions—Unexplained movement of funds to or from countries with lax anti-money laundering laws or active sanctions; and
(11) Unsolicited Third-Party Payments—Settlements or deposits arriving from unrelated corporate or individual accounts.



Exhibit A

F. With trade-based money laundering, criminals use global commerce to turn dirty money into clean-looking commercial assets or payments. Instead of moving physical cash or simple wire transfers that trigger bank alarms, criminals manipulate the details of a trade transaction. Trade-based money launderers often use the following techniques:

(1) Price Misrepresentation—Over-valuing or under-valuing goods on an invoice so that money flows from the importer to the exporter (or vice versa) to pay off a criminal debt.
(2) Quantity or Quality Misrepresentation—Shipping fewer items than paid for (short-shipping), shipping trash instead of luxury goods, or mislabeling items.
(3) Phantom Shipments—Issuing invoices and paperwork for goods that are never actually shipped at all.
(4) Multiple Invoicing—Using the same single trade shipment to submit multiple invoices to different financial institutions to get multiple payments.

G. Virtual currency, also known as cryptocurrency, is generally defined as an electronically sourced unit of value that can be purchased with, sold for, or used as a substitute for fiat currency (i.e., currency created and regulated by a government). Cryptocurrency is not issued by any government, bank, or (with limited exceptions) companies. It is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Cryptocurrency can be quickly transmitted directly between parties and across national borders, without the need for a facilitating third party like a traditional financial institution. Many cryptocurrencies, including Bitcoin and Tether, operate via a "blockchain," a record (or ledger) of every transaction ever conducted that is distributed throughout the network. The blockchain will not list the names of parties to the transaction but will list the date and time of the transaction, the originating and receiving public address, and how much cryptocurrency was transferred.

G. USDT (also known as Tether) is a stable coin cryptocurrency with a value meant to mirror the value of the U.S. dollar. USDT tokens are backed by offshore banks. Offshore banks offer fewer charges for operation and tax benefits, but they aren't always fully secure like the FDIC-insured U.S. banks.

H. A cryptocurrency wallet may contain multiple cryptocurrency addresses and can hold multiple types of cryptocurrency. Ownership



**Exhibit A**

of a cryptocurrency wallet denotes stewardship of the multiple addresses therein.

I. Wallets can be backed up in several ways. The digital files associated with the wallet might be stored locally on the user's computer or stored remotely in the cloud. Alternatively, a user can generate a "recovery seed," a pseudo-random collection of approximately 12 to 24 natural language words from which wallet software can mathematically derive all their public addresses and private keys, allowing the user's wallet to be recreated on any computer or smartphone. A recovery seed can be stored, for example, in a digital text file on a computer or smartphone or written on a piece of paper. If a user retains a copy of their recovery seed, they retain control of their cryptocurrency, regardless of any devices law enforcement decides to seize, unless and until the latter can move the funds to a new, government-controlled wallet.

J. Cryptocurrency can also be stored on a hard wallet, a device like a USB thumb drive that keeps all the accounts off-line. This helps prevent hackers from getting to the cryptocurrency. Hard wallets work by storing the private key, keeping it off the Internet and therefore mitigating the risks of cryptocurrency being compromised in an online attack. A hard wallet can be used to conduct a transaction when it is plugged into a computer, unlocked with a PIN or passphrase, and then connected to the internet to initiate the sending or receipt of funds. If a hard wallet is lost or stolen, the private key can be regenerated using a recovery seed. This recovery seed enables the user to move the private keys to a new hard wallet.

K. It is possible to use the blockchain to trace funds forwards and backwards from a single address or a single transaction, similar to the way investigators trace the movement of funds in fiat currencies.

L. Despite the anonymized nature of a cryptocurrency blockchain, information identifying the sender or the recipient of a transaction can be obtained from payment processors or vendors. This information helps investigators identify payment streams—a single flow of funds over time—believed to belong to the same pool of funds controlled by individuals.

M. In cryptocurrency money laundering, the professional money launderers, who are responsible for collecting the bulk currency within the consumer countries and depositing the currency into the U.S. banking system, which they use to purchase cryptocurrency. They



Exhibit A

often then pay out the narcotics traffickers in fiat currency within the source countries, minus a commission, and sell the cryptocurrency to a separate "crypto" broker. The commission fee is generally between 3 to 5 percent. This crypto broker may then conduct a series of cryptocurrency transactions across multiple cryptocurrency exchanges using an array of methods (*e.g.*, cryptocurrency scrambler) in effort to hide the true origin of the money. These crypto brokers often then sell the cryptocurrency in the "black market" in exchange for various fiat currencies.

N. Unhosted TRON wallet addresses and unhosted Ethereum wallet addresses are held on a digital wallet that is not attributed/assigned to an individual or business entity by a Cryptocurrency Exchange, such as Binance Exchange, Coinbase Exchange, OKX Exchange. Unhosted TRON wallet addresses and unhosted Ethereum wallet addresses can be supported by stand-alone digital wallets on a device like a smartphone, laptop, personal computer and other devices that are connected to the internet or a cold storage wallet on devices not connected to the internet. Due to the decentralized nature of the Ethereum and TRON Blockchains, the networks rely on fees, sometimes referred to as "gas fees" to be charged to facilitate transactions on the Ethereum and TRON Blockchains.

O. For example, if an unhosted Ethereum wallet address has a balance of any amount of USDT, that unhosted Ethereum wallet will not be able to send or transfer USDT to another Ethereum wallet address unless that unhosted Ethereum wallet address contains Ether ("ETH"), the native currency for the Ethereum blockchain. Because USDT relies on the Ethereum Blockchain to facilitate its transfer, it requires ETH "gas fees" to be deducted or charged from the unhosted Ethereum wallet address balance to facilitate USDT transactions. This example is also applicable to an unhosted TRON wallet address, the TRON Blockchain and its native currency Tronix (TRX). The ETH and TRX "gas fees" costs fluctuate (between pennies to tens of dollars) for each transaction based on the amount of computational resources required for the action, as well as the current demand for those resources on the Blockchain network. In general, the more demand there is on the respective Blockchain network for a particular action, the higher the gas fees.

P. Because ETH and TRX are needed to pay for "gas fees" to facilitate USDT transactions for unhosted Ethereum and TRON wallet addresses, particular attention is needed to identify when



Exhibit A

> Cryptocurrency exchanges, such as Binance accounts or other unhosted Ethereum and TRON wallet addresses provided or transferred the initial and subsequent ETH and TRX deposits to unhosted Ethereum and TRON wallet addresses. As an example, if a Binance account user deposited the initial ETH to a newly generated unhosted Ethereum wallet address this would suggest some type of association, link or possible dominion of that unhosted Ethereum wallet address and the Binance account. Additional analysis of the unhosted Ethereum and TRON wallet addresses and the Binance account users' transactional patterns could be used for attribution of an unhosted Ethereum wallet address. This example is also applicable to an unhosted TRON wallet address, the TRON Blockchain and its native currency TRX.

6. This Declaration is based upon my training and experience, as well as my personal knowledge derived from the investigation, review of reports, claims data, and public records, and information obtained from other agents or witnesses. Since this Declaration is being submitted for the limited purpose of establishing the basis for this civil forfeiture action, as set forth herein, I have not included every fact known to me concerning this investigation, but only those facts that I believe are necessary to establish—more likely than not—that the assets listed below (the "Defendant Property") represents property which constitutes or is derived, directly or indirectly, from proceeds traceable to violations of 21 U.S.C. §§ 841 and 846 (Drug Trafficking and Conspiracy to Commit Drug Trafficking) and/or constituted proceeds of and/or were involved in, and/or used to facilitate violations of §§ 1956(a)(1)(B) (Money Laundering), 1956(a)(2) (International Money Laundering), 1956(h) (Conspiracy to Commit Money Laundering), and/or 1960 (Operating an Unlicensed Money Transmitting Business), and that the Defendant Property is therefore subject to civil forfeiture to the United States.



**Exhibit A**

## II. PROPERTY TO BE FORFEITED

7. The Defendant Property (hereafter, collectively, the "**Tether**" or the "**USDT**") consists of the following assets:

| Asset ID | Asset Description |
| --- | --- |
| 26-DEA-728123 (a/k/a TA1, hereafter "**TAk**") | 1,348,608.304048 USDT, seized from cryptocurrency address TAk4uSwGLs3uk2cx9E26pxJQHia76UAoLU |
| 26-DEA-728124 (a/k/a TA2, hereafter "**TLq**") | 2,449,931.906716 USDT, seized from cryptocurrency address TLq6rx1VCWZNY13en61fCaf3dsCsLgdMj5 |
| 26-DEA-728125 (a/k/a TA3, hereafter "**TB6**") | 1,802,234.715362 USDT, seized from cryptocurrency address TB6agEwmYP71w9Tu5Wf8Gjtvraqz2NM2JA |
| 26-DEA-000465 (a/k/a TA4, hereafter "**TUa**") | 775,594.91544 USDT, seized from cryptocurrency address TUa42ddw8nfHvfKUBbbvn7KQVXVZurp3pU |

with a total value of approximately $6,376,370.85. **TAk**, **TLq**, and **TB6** were held by an unidentified party located in El Salvador. **TUa** was held in the name of Chuchun Lin, located in Shenzhen, China. Tether International froze **TAk** on December 19, 2025, **TLq** and **TB6** on December 24, 2025, and **TUa** on January 14, 2026, and the U.S. Marshal Service seized—on behalf of the DEA—all the **Tether** on May 14, 2026. The **Tether** are:[1]

a. Funds traceable to, and are therefore proceeds of, distribution of controlled substances, committed in violation of 21 U.S.C. § 841, and therefore are subject to civil forfeiture under 21 U.S.C. § 881(a)(6);

b. Funds involved in, or traceable to funds involved in, unlicensed money transmitting, committed in violation of 18 U.S.C. § 1960, and therefore are subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A); and

c. Funds involved in, or traceable to funds involved in, money laundering offenses, committed in violation of 18 U.S.C. §§ 1956 and 1957, and therefore are subject to civil forfeiture under 18 U.S.C. §§ 981 (a)(1)(A).

1 Other target addresses will be mentioned in this declaration. However, those accounts have not been seized because they are either pass-through accounts that will not have significant amounts of cryptocurrency in them or seizure of the accounts will alert the target subjects to the existence of this investigation.



Exhibit A

8. The **Tether** was identified throughout the course of the investigation outlined below as being associated to money laundering activity in ways to include, but not limited to receiving illicit proceeds, disbursing illicit proceeds, storing illicit proceeds and/or acting as a liquidity provider for illicit funds that are 'mirrored' into cryptocurrency forms. For example, it is common for traffickers to deliver drug proceeds to money launderers in one jurisdiction, which subsequently leads to the "release" of cryptocurrency or funds in another jurisdiction. This declaration describes transactions and observations outlined in the respective "Transaction" subsections, in addition to patterns observed by investigators in similar investigations as they pertain to the laundering of illicit proceeds through means of cryptocurrency.

9. This complaint is connected to an ongoing criminal and financial investigation taking place within the Eastern District of Texas and elsewhere regarding multiple money laundering and drug trafficking individuals engaged in the collection and laundering of illicit proceeds throughout the United States and beyond. Most of the criminal activity within the district occurred in Collin and Denton counties. In September of 2022, DEA personnel with the Dallas Field Division began investigating a money laundering organization involved in the purchase and sale of electronics throughout the world. Investigators learned that electronics were being purchased in the United States with bulk cash, later confirmed to be earned through the sale of narcotics. The cash would then be used by subjects in foreign countries to purchase electronics which were ultimately delivered to other countries. In many cases, the money launderers would reach agreements



**Exhibit A**

with drug traffickers regarding loans on the cash utilized to purchase the electronics, and the drug traffickers would eventually be paid back following the sale of the goods.

10. Throughout the course of the investigation, individuals using the trade-based money laundering efforts outlined above were found to use subjects and overlap with other known drug traffickers using cash-to-cryptocurrency money laundering methods. In these instances, drug traffickers would arrange for the pick-up of bulk cash and request the cash be converted to cryptocurrency. The drug trafficker would then provide a cryptocurrency address and ask for the proceeds to be sent to the address, which would commonly be found to be managed by money launderers based in Mexico, Colombia, and other source countries.

## III. PROBABLE CAUSE

### Drug Trafficking and Money Laundering Investigation

11. Information contained in this declaration has been compiled through my own investigative efforts as well as the investigative efforts and knowledge from other law enforcement officers and intelligence analysts. This affidavit is not all-inclusive, and facts contained in this declaration are believed sufficient to establish by a preponderance of the evidence that the **Tether** is subject to forfeiture.

12. The DEA has been investigating multiple Mexican and Chinese-based money launderers involved in the collection of bulk cash in the United States in exchange for cell phones. Following the arrest(s) of subjects delivering the bulk cash, it was determined that the cash was earned through illicit means such as narcotics trafficking and/or offenses related to unreported income or business proceeds. Multiple subjects have been identified



**Exhibit A**

as acting as money brokers (“money launderers” or “MLs”) on behalf of drug traffickers (“DTs”) and have been responsible for arranging the delivery of bulk cash to DEA undercovers (“UCs”) and Confidential Sources (“CSs”) throughout the United States since September 2022. Through various investigative means, it was determined that many of these subjects coordinate with one another to facilitate bulk cash deliveries and claim ownership over the money delivered.

13. For example, in December 2022, DEA personnel arrested a subject later cultivated as DEA CS1, previously identified for being responsible for collecting approximately $7,000,000[2] worth of drug proceeds throughout the United States between August 2021 and December 2022 on behalf of multiple Mexican and Chinese-based money launderers. CS1 advised the subjects directing them to collect the cash included ML1, ML2, ML3, ML4, and ML5. CS1 stated that following the collection of the cash, the money launderers would ship out electronics proportionate in value to the amount of cash delivered to addresses provided by the money launderers. Often, the addresses were in the United States, but CS1 advised the electronics would eventually be shipped out of the United States for resale in countries such as Mexico.

14. Following the arrest of CS1, DEA personnel began investigating ML1 and ML2, Mexican-based subjects residing in Guadalajara, Jalisco, Mexico. Shortly after the initial investigation into ML1 and ML2 began, a DEA UC was introduced to both ML1 and ML2 and began posing as a United States-based money launderer. Since the introduction,

2 All references to money are in U.S. Currency, unless otherwise indicated.



Exhibit A

ML1 and ML2 arranged multiple deliveries of bulk cash in the United States ranging from approximately $10,000 to $300,000 at a time. Subsequent investigations revealed the subjects delivering the drug proceeds were operating on behalf of foreign-based narcotics sources of supply, and as such, the bulk cash being delivered was determined to be illicit funds, specifically, drug proceeds.

15. As of September 2025, this investigation has resulted in the arrest of at least 120 defendants and the seizure of more than 3,000 kilograms of methamphetamine, 180 kilograms of marijuana, 700 kilograms of cocaine, 110 kilograms of heroin, and approximately $55,000,000 USC (combined currency and assets). At least one co-conspirator—ML11—was murdered in Mexico, apparently over a dispute with the drug traffickers he worked with and the seizure of $1,300,000 in drug proceeds that ML11 was handling.

16. CS3 advised of a DTMLO cell operating in the Chicago area. According to CS3, DT1 received up to 400 kilograms of cocaine per week for further distribution in the greater Chicago area. DT1's sources could transport up to 3 metric tons of cocaine into the United States per month.

17. As of November 2024, the rate per kilogram of cocaine in the Chicago area was approximately $16,000 per kilogram. Therefore, at a rate of 400 kilograms per week, DT1 was suspected to have received approximately $6,400,000 from cocaine sales weekly.

18. Between May 6 and December 5, 2025, I, acting in an undercover capacity, coordinated with DT1 to conduct a total of 36 money pick-ups on behalf of DT1. These pick-ups occurred in cities such as Chicago, Dallas, Newark, and Philadelphia



Exhibit A

(Pennsylvania). In total, approximately $5,984,568 was collected on DT1's behalf and laundered through dozens of cryptocurrency addresses that DT1 provided me.

19. On June 08, 2025, CS2 advised of a subject (ML6) that CS2 had been communicating with via WeChat. According to ML6's WeChat, ML6 was based in Haidian, Beijing. CS2 was introduced to ML6 through ML7, who also used WeChat. CS2 advised that ML6, ML7 and ML5 were all associates involved in the collection of bulk cash in the United States in exchange for electronics to be shipped to China.

20. CS2 later met Vinh-Dinh PHAM through ML6. PHAM had planned to conduct a transfer with CS2 in exchange for cryptocurrency, but abruptly canceled it, apparently out of suspicion that CS2 was working with the police.

21. On June 26, 2025, the DEA seized $110,791 and 2 money counters from PHAM in connection with PHAM's (and his partner's, Kaijun "Ben" GUO's) part of this money laundering conspiracy. On October 13, 2026, the United States Attorney's Office filed a Verified Complaint against the seized $110,791 and 2 money counters in *United States v. $110,791.00 U.S. Currency, et al.*, No. 4:26-cv-01487.

**The Transactions Into TAk, TLq, TB6**

22. The transactions referenced in this affidavit were determined from the review and analysis of the Ethereum and TRON blockchains by DEA financial investigator(s).

23. The information below, in relation to the flow of suspected drug proceeds, does not include each specific transfer within the listed addresses, but rather highlights transfers found to be relevant in terms of timing and quantity of funds being transferred.



Exhibit A

24. In December 2025, DEA personnel obtained a seizure warrant for the USDT located within multiple cryptocurrency wallets to include unhosted wallet "TWA, found to receive and distribute funds on behalf of DT1, which were believed to be cocaine proceeds. Below is a text chart which supports the seizure and documents the time of transfer, sending address, receiving address, and amount of funds in USDT.

| Time (UTC) | Sending Address | Receiving Address | USDT |
|---|---|---|---|
| 2025-12-02 22:01:03Z | DEA UC Account | TJo5sXHyZFQmgAYJ5uZSSi6grFD3NehDJX (TJo5) | 1000 |
| 2025-12-02 23:15:03Z | DEA UC Account | TJo5 | 200000 |
| 2025-12-02 23:53:57Z | DEA UC Account | TWmWWwJZXXLoypLNvCaB5BqF6VLAfWpbvu (TWm) | 1000 |
| 2025-12-03 00:04:09Z | TJo5 | TGCReSBaCUeG6nAhyKiCTPVqQRAi4azGv5 (TGC) | 100 |
| 2025-12-03 00:22:42Z | DEA UC Account | TWm | 19000 |
| 2025-12-03 00:22:54Z | TJo5 | TGC | 49900 |
| 2025-12-03 00:32:12Z | DEA UC Account | TJopRhYMDi668GuCkBLRn9fcgP4jRZeBAH (Tjop) | 1000 |
| 2025-12-03 01:53:21Z | DEA UC Account | Tjop | 71789.20 |
| 2025-12-03 14:40:15Z | Tjop | TUd8i8iwr44QRFgpv4d4MVxmCMEwbSTkBe (TUd) | 132800 |
| 2025-12-03 14:54:27Z | TUd | THPYgFY516JWwJmVLSK3suCcWyv2KkkCML (THP) | 15000 |
| 2025-12-03 15:34:30Z | TGC | TKbqvdrPQRmVGus1We7pKepJFuHxDKcq1d (TKb) | 11000 |
| 2025-12-03 15:59:06Z | TUd | TKKEapjH3NqKLC2M5CXrv2h4wcGAVDEzM9 (TKK) | 117798 |
| 2025-12-03 16:00:21Z | THP | THV4gdYZEzmqfW1fU7naeAVF2seEa9W6hs (THV) | 117798 |
| 2025-12-03 16:01:39Z | THV | TYp85KxYupy2aVxH7Mf7vopqRUtdnxf3k4 (TYp) | 30000 |
| 2025-12-03 16:41:24Z | THV | TWANbWj9YXV45YyoXMaeKVZAwgwWxM7rX7 (TWA) | 26725 |

25. Following the seizure of TWA, further analysis of the TWA transactions revealed that an address previously seized by DEA Chicago and TWA interacted with a common address, **TAk**, which is also suspected to be involved in the laundering of drug proceeds.

26. Transfers to **TAk** from TWA occurred during the same time frame as the imposed freeze on TWA, and the same can be said for the transfers from the address seized by DEA Chicago to **TAk**.



Exhibit A

27. In October 2025, DEA Dallas Field Division personnel began investigating deposit address "TLn," identified as a TRON address used to receive bulk currency identified as drug proceeds through bulk cash pick-ups organized by ML2.

28. Between November 20, 2025, and December 15, 2025, TLn received a total of approximately 323,000 USDT from "TNT." In the late evening of December 15, 2025, TNT sent TLn 260,000 USDT and 40,000 USDT in 2 separate transactions.

29. Tracing efforts revealed the 300,000 USDT was transferred to TNT by "TDU" on the evening of December 15, 2025. TDU sent TNT its first "funding" fees on November 10, 2025, a total of approximately 1,019 TRX.

30. Additional tracing efforts showed TDU received 300,000 USDT from **TLq** on December 15, 2025 in the afternoon. Analysis of **TLq** showed no previous incoming deposits of that amount.

31. Further analysis of **TLq** showed that several hours prior to sending out 300,000 USDT to TDU, **TLq** received 200,000 USDT from **TB6**.

32. In total, **TLq** received approximately 600,000 USDT from TB6 over 5 transfers between December 7 and December 14, 2025.

33. Based on this sequence of events, I believe that **TB6** funded **TLq**, which ultimately flowed to an account (TLn) known to be utilized to launder drug proceeds in the amount of approximately 300,000 USDT.

**<u>The Transactions Into TUa</u>**

34. The overall trend behind TLn showed it received large USDT TRC-20 transfers and subsequently disburse the transfers to other addresses through the OKX



**Exhibit A**

exchange, to which TLn belongs. TRC-20 is also known as USDT on the TRON blockchain. USDT TRC-20 allows for the quick and efficient transfer of assets across international borders with very small transactional fees. The primary address observed disbursing the USDT was OKX address "TLa".

35. On November 13, 2025, TLn received a total of approximately 15,113 USDT from an address previously observed to be used by a drug trafficking and money laundering cell operating internationally, TBn, which was previously observed interacting with an address provided to a DEA UC by a known drug trafficker to deposit drug proceeds. Furthermore, the illicit funds that flowed through TBn ultimately ended up in address "TJL," which was known to b-e utilized by a cocaine trafficker and money launderer and was previously seized.

36. Following the deposit of the 15,113 USDT into TLn, investigators conducted an analysis of it and observed this OKX account to have conducted a series of outgoing transactions to "TMT" from November 13, 2025, to November 28, 2025, totaling approximately 85,000 USDT.

37. TMT was later found to have sent approximately 70,671 USDT to **TUa** on November 22, 2025, and approximately 112,231 USDT on November 23, 2025.

38. **TUa** was also found to have received approximately 170,000 USDT from "TU7" on November 23, 2025, which also sent TMT its first gas fees—2 TRX—on November 9, 2025.



**Exhibit A**

***Post-Freeze Analysis***

39. Based on this investigation, just a fraction of which is summarized above, I sent a request to Tether International, the issuer of USDT, to freeze **TAk**, **TLq**, **TB6**, and **TUa**, pending issuance of a seizure warrant. Tether International confirmed via correspondence that the addresses had been frozen and indicated the times and dates the accounts were frozen and how much USDT each account held at the time of the freeze.

40. Following the freeze, the following activity was observed relative to **TAk** and **TLq**. Unhosted address "TAt" was found to have directly sent both **TLq** and **TAk** trace amounts of TRON several hours after Tether froze **TLq** and **TAk**.

41. Pursuant to Tether's policy, once a freeze is imposed on an address deemed within their risk tolerance, the address is still capable of receiving additional funds but is unable to transfer out funds. In this sense, the freeze acts in a damming manner. In some cases, by the time the address is officially frozen by Tether, some, or all of the funds, may have been distributed to other addresses. The damming effect outlined above allows for law enforcement to capture and seize any additional funds from the previously determined address involved in the money laundering activity.

***Seizure and Transfer to United States Marshal's Service (USMS)***

42. On January 12, 2026, I presented a seizure warrant to Magistrate Judge Bill Davis of the United States District Court Eastern District of Texas for the USDT located within **TAk**, **TLq**, and **TB6**. Judge Davis subsequently granted the seizure warrants based on his probable cause finding that the addresses were used to launder and conceal suspected illicit proceeds.



**Exhibit A**

43. On May 14, 2026, Tether International conducted 3 transfers related to **TAk**, **TLq**, and **TB6** to a USMS-controlled wallet.

44. On February 9, 2026, SA Reilly presented a seizure warrant to Magistrate Judge Aileen Goldman Durrett of the United States District Court Eastern District of Texas for the USDT located within **TUa**. Judge Goldman Durrett subsequently granted the seizure warrant based on her probable cause finding that the address was used to launder and conceal suspected illicit proceeds.

45. On May 14, 2026, Tether International conducted 1 transfer related to **TUa** to a USMS-controlled wallet.

***Post-Seizure Events***

46. The **Tether** seized from **TAk**, **TLq**, **TB6**, and **TUa** could not be administratively forfeited, as federal law limits administrative forfeiture to "virtual assets valued at less than or equal to $500,000." *Asset Forfeiture Policy Manual 2025*, Ch. 6-3. Therefore, the United States is limited to civil or criminal forfeiture, and no notice of the seizure of the **Tether** has been sent and no claims have been received concerning the **Tether**.

***Conclusion***

47. Based upon all of the foregoing, there is probable cause to believe that the **Tether** seized from **TAk**, **TLq**, **TB6**, and **TUa** contain property traceable to the distribution and sale of narcotics in violation of 21 U.S.C. §§ 841 and 846, and/or are property involved in money laundering and unlicensed money transmitting in violation of 18 U.S.C. §§ 1956 and 1960, respectively.



**Exhibit A**

48. Under 18 U.S.C. § 1956 it is unlawful, in part, to conduct a financial transaction, knowing that the property involved in the financial transaction represents the proceeds of some form of specified unlawful activity, knowing that the transaction is designed in whole or part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

49. Likewise, 18 U.S.C. § 1960 makes it unlawful to engage in an unlicensed money transmitting business, defined as one which affects interstate or foreign commerce in any manner or degree, is operated without an appropriate license in a state, whether or not the transmitter knew that the operation was required to be licensed, is not in compliance with the money transmitting business registration requirements under 31 U.S.C. § 5330, which requires that money transmitting businesses be registered with the Secretary of the Treasury, or otherwise involves the transportation or transmission of funds that are known by the transmitter to have been derived from a criminal offense, or are intended to be used to promote or support unlawful activity.

50. Accordingly, I submit that there is probable cause to support the civil forfeiture of the **Tether** seized from **TAk**, **TLq**, **TB6**, and **TUa**, pursuant to 21 U.S.C. § 881(a)(6) (civil forfeiture of drug proceeds) and 18 U.S.C. §§ 981(a)(1)(A) and (C) (civil forfeiture of property involved in money laundering and unlicensed money transmitting).



**Exhibit A**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 3, 2026.

Sean P. Reilly
Special Agent
Drug Enforcement Administration



Exhibit A